In the Matter of the Application of ALBERT ROSS, Petitioner, for an Order against S. HOWARD COHEN and Others, as Members of the Board of Elections in the City of New York, and H. WARREN HUBBARD, as City Clerk of the City of New York, Respondents.*

EDWARD VOGEL, Intervenor.

Supreme Court, Special Term, Kings County, June 3, 1940.

---

* Affd., 259 App. Div. 1020.

*Reginald S. Hardy*, for the petitioner.

*William C. Chanler, Corporation Counsel*, for the respondents.

*Rubinstein & Rosling*, for the intervenor.

NOVA, J. At a general election held on November 7, 1939, the Hon. John Cashmore was elected by the voters of the borough of Brooklyn to serve as a member of the council of the city of New York for a period of two years beginning January 1, 1940, and ending December 31, 1941. After taking the prescribed oath and entering upon his duties, Mr. Cashmore resigned on March 4, 1940, to assume the office of borough president of the borough of Brooklyn. Thereafter, and at a special meeting of the council convened by the mayor of the city of New York pursuant to section 24 of the New York City Charter, the Hon. Edward Vogel was chosen by a majority of the members thereof to fill the vacancy which had thus been created by Mr. Cashmore's resignation. It is alleged that the resolution, pursuant to which Mr. Vogel was thus selected, purported to provide that he serve as a member of the council *for the unexpired balance of Mr. Cashmore's term.*

The petitioner, who is a resident and qualified voter of the borough of Brooklyn, contends that the council could not validly fill the vacancy caused by Mr. Cashmore's resignation for a period effective beyond December 31, 1940. He, therefore, seeks an order herein directing the city clerk to certify that, because of the circumstances as stated above, a vacancy will exist in the said office beginning January 1, 1941, and that said vacancy be filled at the general election to be held on November 5, 1940. The petitioner also asks that the board of elections be directed to conduct the said election in accordance with chapter 43 of the Charter of the City of New York. The provisions thereof require that

councilmen be elected pursuant to a system known as proportional representation.

It is my view that clearly the council was without power to provide that Mr. Vogel's term of office would endure "for the unexpired balance of the term" for which Mr. Cashmore had been elected. Section 8 of article 13 of the Constitution is explicit upon the subject. Therein it is provided that "The Legislature shall provide for filling vacancies in office, and in case of elective officers, no person appointed to fill a vacancy shall hold his office by virtue of such appointment longer than the commencement of the political year next succeeding the first annual election after the happening of the vacancy." Section 38 of the Public Officers Law contains a legislative requirement of similar purport. Thus, there are both a constitutional command and a statutory enactment which render ineffective that portion of the councilmanic resolution which purports to extend Mr. Vogel's tenure of office beyond December 31, 1940. If interpretative judicial authority upon the subject were at all required, recourse might immediately be made to the decision in *People ex rel. Dietz* v. *Hogan* (214 N. Y. 216). In that case the Court of Appeals was called upon to decide the constitutionality of section 18 of the former Greater New York Charter. That section provided that a person chosen by a majority of the board of aldermen to fill a vacancy in that body would remain in office for the *balance* of the unexpired term. The court held that the provision was violative of the above constitutional mandate (former art. 10, § 5). Obviously, the resolution of the council, in purporting to provide that Mr. Vogel's selection would be effective for the balance of Mr. Cashmore's unexpired term, is subject to the identical vice. It necessarily follows that the petitioner's application must be sustained in so far as it seeks an order directing the city clerk to certify that the resulting vacancy in the office, beginning as of January 1, 1941, be filled at the next succeeding general election.

The question immediately arises whether the successor, thus to be chosen, shall be elected pursuant to the procedure applicable to elections generally or whether such election shall be governed by the statutory scheme known as proportional representation. If in accordance with the first procedure, all the pertinent provisions of the general Election Law will prevail; if in accordance with the legislative structure which secures a proportional representation to the electorate, the relevant provisions of chapter 43 of the New York City Charter will control. It is petitioner's contention that, even for the purpose of filling a sole vacancy, the election of a councilman must be conducted pursuant to the latter chapter. I do not agree with that contention.

The fundamental purpose upon which is predicated the legislative conception of proportional representation is that minority groups may be represented in the council in approximate proportion to the relative political strength which they have demonstrated upon election day. In applying the system it is provided that each borough shall constitute a single separate unit for the election of councilmen. Within such unit 75,000 votes suffice for the election of each councilman. Nominations of candidates are not obtained by the holding of primaries but merely by nominating petitions which contain the signatures of a minimum of 2,000 electors. A distinction between the mechanism of the system and the rules governing elections generally may be found in many other important aspects.

A consideration of the provisions of chapter 43 reveals that they contain no specification of the particular manner in which an ensuing election shall be conducted for the purpose of choosing the successor to fill a vacancy in the membership of the council. In ascertaining the legislative intent, is not such omission to be given a significance of vast import? Before advocating its enactment into law, the draftsman of charter revision must necessarily have made a conscientious and thorough study of the various operative ramifications of proportional representation and of the expediency or inexpediency of using that system upon the occurrence of contingencies such as ordinarily and reasonably are to be anticipated. More succinctly stated, they must have contemplated the fact that, in conformity with a plain constitutional requirement, the electorate from time to time might be called upon at the next ensuing election following a vacancy in the council caused by the death, resignation or removal of a member, to elect a successor to that office. May it not, therefore, be fairly concluded that the omission to provide expressly for the particular procedure applicable upon the occurrence of a contingency of such character constitutes not a mere inadvertent hiatus in the law itself, but a tacit or implied recognition of the sheer futility of attempting to use, under such circumstances, the intricate statutory structure upon which the system of proportional representation is founded. That conclusion, in my opinion, seems amply justified by the fact that the very theory upon which proportional representation is predicated reveals strikingly the impracticability and the utter uselessness of its application in the election of a sole candidate. The expression " proportional representation " connotes *ipso facto* that there shall be a *pro rata* selection of candidates — a choice relatively representative of all. Obviously, there can be no apportionment of representation when there is in fact but one candidate

to choose. Under such circumstances, what representation is there to apportion?

Under familiar canons of statutory construction, an absurd purpose is not to be attributed to legislation and such construction, if at all possible, will be avoided. Where there is nothing to apportion, ordinary common sense dictates that there can be no proportional representation. " The thought behind the phrase proclaims itself misread when the outcome of the reading is injustice or absurdity," said Chief Judge CARDOZO in writing for the court in *Surace* v. *Danna* (248 N. Y. 18). Fairly construed then, chapter 43 of the Charter contemplates that the system of proportional representation shall be employed only upon the election of a complete body which shall then constitute the entire membership of the council. Conversely, it does not contemplate the use of that system, or of any of the statutory incidents thereof, upon the election of a single candidate to fill merely an ensuing vacancy in such membership. This conclusion seems fully justified by the very language of section 1002-a of chapter 43 wherein it is declared that " *Councilmen* shall be elected by the system of proportional representation provided for in this chapter, from each borough in proportion to the number of valid votes cast for *councilmen* in the borough as hereinafter provided." The use of the plural expression " councilmen " in the section fairly signifies that the system of proportional representation is made applicable only to the election of the composite body — not to the incidental election of an individual, component part thereof.

Suffice it to say before concluding that any attempt to employ the use of proportional representation under the facts here disclosed would possibly effectuate the nullification of thousands of votes cast by the electorate. The statutory structure of proportional representation provides that when any candidate receives 75,000 votes he is declared elected and the excess number of votes which he has received are then transferred to the person who has received the second choice. Where only one candidate is to be elected the system of proportional representation could not, in any event, fairly operate. This is true for the reason that the particular candidate for whom fortunately the first 75,000 votes were incidentally counted would thereupon be declared victorious and there would then be no need for further tabulation since there would be but a single candidate to be chosen. Such early count of 75,000 votes (out of a possible 900,000 votes of persons normally registered in the borough of Brooklyn) obviously would not necessarily reflect the ultimate will of the electorate. As a matter of fact — except for the 75,000 persons whose votes were thus first counted —

the employment of the system would operate as a virtual disfranchisement of the remaining portion of the electorate as to the choice to be made. In prophetic vein, Chief Judge CRANE, in commenting upon the questionable future efficacy of the system of proportional representation, has said in *Johnson* v. *City of New York* (274 N. Y. 411, 430): " This proposed system may be unworkable; it may be so cumbersome or so intricate as to be impracticable; the results desired may not be obtained; the remedy may be worse than the disease." Indeed applicable is the prophecy to the present situation.

I thus finally conclude that chapter 43 of the Charter fails to provide for the employment of proportional representation upon an election of the character here contemplated. Under such circumstances recourse must be made to the procedure governing elections generally as contained in the general Election Law. The fact that recourse must be made to the generic law is apparent for the reason that, under well-accepted principles of statutory construction, a local law such as the one with which we here deal is deemed to supersede a general law, relating to a comprehensive subject-matter, only with respect to such detailed itemization thereof as expressly or by fair implication specifically purports to fall within the purview of such local law. In other words, the general law remains effective and retains its controlling efficacy except as special provisions to the contrary have been enacted in the local law. Thus where, as here, statutory regulations to meet a reasonable contingency have been intentionally or otherwise omitted in the special provisions pertaining to election by proportional representation, the omission must be cured by reference to and compliance with the procedure set forth in the generic body of the law pertaining to elections generally. Such conclusion immediately suggests the further thought that, since it is required that the contemplated election be held pursuant to the provisions of the Election Law rather than pursuant to those contained in chapter 43 of the Charter, the entire procedure applicable to elections generally must be adhered to in this particular instance. The importance of the procedural distinction will become readily apparent when it will be observed, among other things, that the provisions of the general Election Law relating to the holding of a primary election (Cf. Election Law, § 131, subd. 8; N. Y. City Charter, § 1004, subd. a), the requisite number of signatures to validate a petition (Cf. Election Law, § 136, subd. 2; § 137, subd. 4; N. Y. City Charter, § 1004, subd. b), prescribed dates within which the petitions may be circulated and upon which they must be duly filed (Cf. Election Law, § 136, subd. 4; § 140, subds. 1, 8; and

N. Y. City Charter, § 1004, subds. f, g), the particular method of voting by the use generally of voting machines (Cf. Election Law, §§ 243, 246; N. Y. City Charter, § 1005), and the other procedural incidents prescribed by the general Election Law must necessarily control.

An order, to be settled upon notice, will, therefore, issue directing the city clerk to certify that a vacancy will exist in the said office beginning as of January 1, 1941, requiring the holding of an election to fill the same upon November 5, 1940. The application, however, in so far as it demands that such election be held in accordance with the provisions relating to proportional representation, is denied.