OPINION OF THE COURT
Joseph J. Dowd, J.
Petitioners, Citizens for the Preservation of Windsor Terrace, an unincorporated association, consisting of homeowners and residents of Windsor Terrace and other residents adjoining at or near the subject site move by order to show cause for an order directing city respondents as well as the developers on the site, to comply with the State Environmental Quality Review Act (SEQRA; ECL art 8), City Environment Quality Review (CEQR) and the Mayor’s Executive Order No. 91, dated August 24, 1977, and for preliminary injunctive relief *968 enjoining respondents from proceeding with any construction, foundation and earthwork or other construction activity in connection with the building site (a proposed lSíi-story condominium apartment building) pending compliance by respondents with the aforestated environmental review procedures.
Petitioners also seek to revoke any foundation permits issued by the city respondents.
City respondents joined by the developers cross-move opposing the petition and seek an order dismissing the petition on the ground that it fails to state a cause of action.
In addition, respondents contend that petitioners have not established the statutory requirements necessary to sustain the preliminary injunctive relief requested.
This case represents the classical internal struggle that takes place daily in our large urban centers as the courts are requested to balance competing social, economic and environmental interests pursued by various segments of our society. In its deliberations, the courts are ever mindful of the overriding principle that parochial concerns must give way to the common good, it is the process by which this is accomplished that defines the rule of law in a democracy such as ours.
The salient facts not seriously contested by the parties are as follows:
On August 1, 1985, respondents developers, Rende and Esposito, filed an application for excavation work at 207 Prospect Park South West, across the street from Prospect Park, listed on the National Register of Historic Places, seeking permission to build a 13Vi-story condominium. On September 20, 1985, the application was granted and a permit for excavation and foundation work was issued.
On or about October 10, 1985, the developers sent notices to the adjoining property owners that they intended to commence excavation work in connection with the construction of the building in question; site clearing was commenced, however, no environmental review had been undertaken and petitioners initiated this proceeding.
The threshold issue presented for review is whether respondents must comply with the relevant environmental statutes. Specifically, the inquiry posed is whether the issuance of the building and excavation permit triggers the necessary environmental procedures or whether the issuance of a permit constitutes a "ministerial act” exempt from the strictures of the law, as contended by respondents (New York State Envi *969 ronmental Quality Review Act, ECL 8-0105 [5]; 6 NYCRR 617.2 [n], [s]; City Environmental Review, Mayoral Executive Order No. 91., Aug. 24,1977, § 1 [a] [1]; § 4 [e]; § 15, Type I).
In response to the growing concern with the unchecked rape of our environment, New York in 1975 joined a number of States (28) that had followed the Federal lead (National Environmental Policy Act [NEPA], 42 USC §§ 4321-4347) in adopting a State Environmental Quality Review Act (SEQRA) which mandates that New York governmental units "conduct their affairs with an awareness that they are stewards of the air, water, land, and living resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations.” (ECL 8-0103 [8].)
Under the statutory mandate, public agencies are to develop necessary measures to bring their authority and policies into conformity with the intent and purposes and procedures of SEQRA. These provisions impose a positive duty on agencies to make changes that are within their power or to recommend legislative or other actions which may be required to change their regulations or policies to take into account the environmental policies set forth in SEQRA. Pursuant to this statutory direction, Executive Order No. 91 effective August 21, 1977 was issued implementing SEQRA (ECL 8-0109 et seq.) and issued procedures known as CEQR. In addition, the New York State Department of Environmental Conservation (DEC) issued regulations prescribing the manner in which all State agencies and local governments must comply with the mandates of SEQRA (6 NYCRR part 617).
The stated purpose of the environmental legislation in question is to “encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources; and to enrich the understanding of the ecological systems, natural, human and community resources important to the people of the state.” (ECL 8-0101.) The Legislature further declared its intent that "protection and enhancement of the environment, human and community resources shall be given appropriate weight with social and economic considerations” (ECL 8-0103 [7]).
Environment is defined under the statute as: "[T]he physical conditions which will be affected by a proposed action, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance, existing patterns of popula *970 tion concentration, distribution, or growth, and existing community or neighborhood character.” (ECL 8-0105 [6].)
The centerpiece of the act which provides the implementation of these policies is the requirement that all agencies cause to be prepared an environmental impact statement (EIS) with respect to any action they propose or approve which may have a significant effect on the environment (ECL 8-0109). The impact statement provides eight enumerated items of information intended to focus on possible adverse effects on the environment which might result from the action, and to eliminate or minimize such effects, as well as such other information as may be required by the relevant guidelines.
Subdivision (4) of ECL 8-0109 requires an agency to determine, as early as possible, whether an EIS need be prepared for a given action.
It is patently obvious from the above reading that State policy recognizes that the threat to the environment is not its sudden destruction, but its progressive degradation; environmental deliberation, not default, is mandated.
Power to implement procedures is granted to the Department of Environmental Conservation (DEC) (ECL 8-0113) to further define SEQRA’s terms, to establish criteria for determining whether a proposed action may have a significant effect on the environment, to identify actions that would likely require preparation of an impact statement and to establish procedures for hearings and comments on principles (6 NYCRR part 617).
Thus, the implementing regulations provide guides in determining what actions are and are not subject to the requirement for the preparation of an impact statement. The criteria established provide among other facts, "substantial adverse change[s] in air quality, water quality or noise levels”, "creation of [health] hazard[s]”, "substantial change[s] in [land] use”, and "impairment of * * * historical, archeological, architectural and aesthetic resources”. (6 NYCRR 617.11 [a].)
Based on these criteria, the regulations list actions likely to require the preparation of environmental impact statements described as Type I actions (6 NYCRR 617.12) including such activities as the adoption of land use plans or zoning regulations, major rezoning requests by developers, construction of specified numbers of residential projects in different types of municipalities, etc. (See, 6 NYCRR 617.12 [b] [1], [2], [5].) Agencies may adopt their procedures to expand, but not diminish, the Type I list.
*971 There is a separate list of actions which never require an EIS, known as Type II actions. (6 NYCRR part 617.) These include — in-kind replacements of facilities, individual setbacks —and lot line variances and paving most highways and the construction of garages, swimming pools and barns. There are no procedural requirements applicable to Type II activities; agencies may expand their Type II list provided they do not include actions which may have a significant effect on the environment (6 NYCRR 617.13 [b]).
The regulations also provide for a procedure to determine the environmental significance of actions not on either list, the so-called unlisted actions (6 NYCRR 617.11).
The driving spirit of the SEQRA process is the analysis of alternatives (6 NYCRR 617.14 [fj [5]), i.e., the balancing of social and economic benefits against adverse environmental effects and the consideration of potential mitigation measures.
To complete the statutory scheme, the Legislature has exempted "ministerial actions” from the mandate of the statute. Section 8-0105 (5) (ii) of SEQRA specifically provides that actions do not include "official acts of a ministerial nature, involving no exercise of discretion”.
6 NYCRR 617.2 (t) defines a ministerial act as "an action performed upon a given state of facts in a prescribed manner imposed by law without the exercise of any judgment or discretion as to the propriety of the action”; similar expressions are to be found in CEQR (Executive Order No. 91, § 1 [a] [1]; § 4 [e]; § 15, Type I).
Several Department of Building directors and communities have advised that the issuance of approvals of plans and applications, and "as of right” building permits for new buildings and foundation and earthwork are certified as ministerial in nature.
It is against this statutory background and development that the issue herein is to be decided.
Respondents contend that the approval for excavation work for the proposed new building is to be determined by objective criteria and that the Commissioner of Buildings is required to grant such permits so long as the permit application complies with the provisions of the Building Code. That these actions are nonjudgmental and ministerial within the meaning of SEQRA and, therefore, do not come within the strictures of the relevant statute.
The court does not accept this view; to do so would be *972 violative of the intent and purpose of the environmental acts and violate both the letter and spirit of the law.
The issuance of the permit may be a nondiscretionary independent ministerial act, but if the excavation is the prelude to erecting a structure that would endanger the environmental balance of the affected community then it would seem to defeat the purpose of SEQRA; it would require an agency to take an environmental destructive action on the theory that it had no discretion to do otherwise.
The court has researched the problem and finds no appellate authority in this jurisdiction bearing on the issue presented, however, further search reveals that a number of States, notably Washington and California, have environmental impact laws with parallel mandates and have ruled on the issues presented herein.
Pressman v City of New York, 78th St., Mount Neboh Preservation Committee v McGough and Walden School Constr. v City of New York, all cited by respondents in support of their position, are decisions from courts of coordinate jurisdiction and accordingly not binding upon this court (Matter of Green v Smith, 65 Misc 2d 588). Moreover, the cited authorities do not present the prevailing view.
Juanita Bay Val. Community Assn. v City of Kirkland (9 Wash App 59, 510 P2d 1140) is a case directly in point with the case at bar. In that case, a developer sought and was granted a grading permit authorizing it to do certain other grading and excavation work upon property as specifically defined by plans filed by the developer with the city; no EIS was filed or prepared.
In that case, as here, respondents argued that "the issuance of building permits, even where that issuance may involve the exercise of some administrative or ministerial discretion, has been judicially determined to be a ministerial act.” (Juanita Bay Val. Community Assn. v City of Kirkland, 9 Wash App 59, 70, 510 P2d 1140, 1148, supra.) Respondents argued further "requiring the City to prepare an Environmental Impact Statement before issuing the grading permit would serve no useful purpose because the city council had no discretion to deny the application for the grading permit once the requirements established by the building department had been met and therefore would amount to requiring the performance of a useless act, something that the law does not require.” (9 Wash App, at pp 70-71, 510 P2d, at p 1148.)
*973 The court rejected the arguments urged by those respondents and held as follows (Juanita Bay Val. Community Assn. v City of Kirkland, 9 Wash App 59, 72-73, 510 P2d 1140, 1149, supra):
"Appellant correctly suggests that the environmental impact of the total project, rather than that of the grading project alone, must be weighed in order to meet the requirements of SEPA. We therefore conclude SEPA requires that an Environmental Impact Statement be prepared prior to the first government authorization of any part of a project or series of projects which, when considered cumulatively, constitute a major action 'significantly affecting the quality of the environment’ * * *
"The change in the substantive law brought about by SEPA introduces an element of discretion into the making of decisions that were formerly ministerial, such that even if we assume, arguendo, that the issuance of a grading permit was, prior to SEPA, a ministerial, nondiscretionary act, SEPA makes it legislative and discretionary. We hold that the City failed to exercise its legislative discretion under SEPA, and consequently grading permit No. G-023 was issued in a manner contrary to law.”
In that case, the Washington appellate court cited both Federal and California authorities in support of its holding.
Thus, the court noted with approval that the Federal courts have held that the granting of a permit to a private party is an "action” subject to NEPA and have enjoined the issuance of such permits in instances where an environmental impact statement was not prepared (see, Citizens for Clean Air v Corps of Engineers, 349 F Supp 696 [SDNY 1972]).
The court also cited the leading California case Friends of Mammoth v Board of Supervisors (8 Cal 3d 247, 502 P2d 1049 [1972]) where it was held that a California statute (SEPA) comparable to NEPA and to our own statute (SEQRA) required a County Board of Supervisors to consider whether a proposed condominium construction may have a significant effect on the environment, and if so, to prepare an environmental impact statement prior to making its decision to grant conditional use and building permits.
Recent case law in New York would seem to indicate that it would follow the lead of the Federal, California and Washington courts on this question. In Matter of Sun Beach Real Estate Dev. Corp. v Anderson (98 AD2d 367), the Appellate *974 Division of this department ruled that preliminary plot approval was so significant a determination during the [environmental] process that an environmental impact statement must be deemed a prerequisite to approval. (See also, Glen Head— Glenwood Landing Civic Council v Town of Oyster Bay, 88 AD2d 484; Matter of Town of Henrietta v Department of Envtl. Conservation of State of N. Y., 76 AD2d 215.)
Thus, the court concludes that upon all the papers submitted and the applicable law, the proposal herein will have environmental reverberations and an ecological impact constituting a significant “action” requiring prior statutory environmental inquiry; the word “significant” being defined as “whenever more than a moderate effect on the quality of the environment is a reasonable probability” (Norway Hill Preservation & Protection Assn. v King County Council, 87 Wn 2d 267, 278, 552 P2d 674, 681).
Petitioners having made out their action, the further inquiry is whether they will be so irreparably harmed as to require injunctive relief. It should be here noted that the present statute does not contain self-imposing enforcement provisions and therefore aggrieved petitioners must assume the burden of establishing each aspect of the traditional statutory test to obtain the preliminary injunctive relief (CPLR art 63). Such equitable relief is particularly important in SEQRA litigation where a petitioner seeks to annul a permit to prevent the implementation of a project. If a permit holder or government agency, however, were to proceed with construction, any judgment a petitioner may subsequently obtain might be rendered moot. In such a case, the project would almost certainly by that time have gained an irreversible momentum. Any initial determination rendered in retrospect upon remand would be little more than an idle gesture. Even if petitioners were successful upon remand, the utility of the resultant environmental impact statement might be severely curtailed because the project will have progressed to a point that will foreclose any meaningful considerations of alternatives as required under ECL 8-0109 (2). Thus, the court holds that any frustration of the SEQRA process through such irretrievable commitment of resources to a project prior to the preparation of an EIS constitutes irreparable injury sufficient to satisfy the injunctive statute.
The court is likewise convinced that the balance of harm would seem to lie with petitioners — an erroneous decision now *975 could possibly forever change the entire environmental impact upon the contested area.
On the other hand respondents’ injury will be mainly monetary and easily rectified.
Moreover, as our Appellate Division stated in Matter of Sun Beach Real Estate Dev. Corp. v Anderson (98 AD2d 367, 375-376, affd 62 NY2d 965, supra), "[w]e have no difficulty in according priority to SEQRA because the legislative declaration of purpose in that statute makes it obvious that protection of 'the environment for the use and enjoyment of this and all future generations’ (ECL 8-0103, subd 8) far overshadows the rights of developers to obtain prompt action on their proposals.”
The challenge regarding the jurisdiction of the Department of Parks over the controverted site would be best left to the environmental process that should take place herein.
Accordingly, the petition is granted in all respects consistent with prevailing ecological principles and concern, and petitioners’ motion for a preliminary injunction is likewise granted and respondents stayed from continuing with their activities pending compliance with the environmental review procedures, and petitioners are directed to post an undertaking in the sum of $75,000 pursuant to CPLR 6312.
Respondents’ cross motion is denied in all respects.